No. 24-30223

———————————◆———————————

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————◆———————————

FRISARD'S TRANSPORTATION, L.L.C.; LOUISIANA MOTOR TRANSPORT ASSOCIATION, INCORPORATED; A & B GROUP, INCORPORATED; TRIPLE G. EXPRESS, INCORPORATED; NORTHLAKE MOVING AND STORAGE, INCORPORATED,
*Appellants*,

v.

UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, Acting Secretary, U.S. Department of Labor; JESSICA LOOMAN, in her official capacity as Administrator of the Wage and Hour Division; UNITED STATES DEPARTMENT OF LABOR, WAGE AND HOUR DIVISION,
*Appellees*.

———————————◆———————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
Case No. 2:24-cv-00347-L Honorable Eldon E. Fallon

———————————◆———————————

## *AMICUS CURIAE* BRIEF OF THE BUCKEYE INSTITUTE IN SUPPORT OF PETITIONERS

———————————◆———————————

Jay R. Carson
   *Counsel of Record*
David C. Tryon
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
J.Carson@BuckeyeInstitute.org

John J. Park Jr.
P.O. Box 3073
Gainesville, GA 30503
(678) 608-1920
(m) 703-888-8329
jackparklaw@gmail.com

*Attorneys for amicus curiae*

## CERTIFICATE OF INTERESTED PERSONS AND DISCLOSURE STATEMENT

*Frisard's Transportation, L.L.C., et al., v. United States Department of Labor, et al.,*
No. 24-30223

Pursuant to Federal Rule of Appellate Procedure 29, The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission. The Buckeye Institute has no parent corporation and no publicly held corporation owns 10% or more of its stock. Counsel is not aware of any person or entity as described in the fourth sentence of Rule 28.2.1 that have an interest in the outcome of this case other than those listed in the parties' certificates. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

       /s/ *Jay R. Carson*
Jay R. Carson
*Attorney of record for*
*amicus curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND DISCLOSURE STATEMENT .................................................................................. i

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF AMICUS CURIAE ...................................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 1

ARGUMENT ...................................................................................... 3

   I.   Introduction ............................................................................. 3

   II.   The 2024 IC Rule ignores the liberty interest of independent workers ........ 10

   III.   Workers also want to work independently to obtain flexibility and economic benefits ..................................................................... 12

   IV.   The Department of Labor's rule will harm the workers it is supposed to help ............................................................................ 17

CONCLUSION ................................................................................. 25

CERTIFICATE OF COMPLIANCE .................................................... 26

CERTIFICATE OF SERVICE ............................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Off Duty Police Servs.*,
  915 F. 3d 1050 (6th Cir. 2019) ........................................................... 7

*Arizona v. Mayorkas*,
  143 S. Ct. 1312 (2023) ....................................................................... 3

*Dynamex Operations West Inc. v. Superior Court of Los Angeles*,
  4 Cal. 5th 903 (2018) ........................................................................20

*Hurtado v. People of State of California*,
  110 U.S. 516 (1884) ........................................................................... 4

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947) ........................................................................... 8

*United States v. Silk*,
  331 U.S. 704 (1947) ........................................................................... 8

*Verma v. 3001 Castor, Inc.*,
  937 F.3d 221 (3d Cir. 2019) .............................................................10

*Wooden v. United States*,
  595 U.S. 360 (2022) ........................................................................... 3

**Other Authorities**

*About Us*, U.S. Dept. of Labor .............................................................17

Allana Akhtar, *'It feels cold and heartless': Hundreds of California
  freelancers have been fired before the holidays over a state law meant to
  help Uber and Lyft drivers*, Business Insider (Dec. 18, 2019) .....................23, 24

*Americans, Deeply Divided, Yet Share Core Values of Equality, Liberty &
  Progress*, Siena College Rsch. Inst. (Oct. 25, 2021) ........................................... 5

John M. Berrios, Yoel V. Hochberg & Hanyi Yi, *Launching with a
  parachute: The gig economy and new business formation*, 144 J. Fin. Econ.
  22 (2022) ...............................................................................9, 19, 20

John Kennerly Davis, *Let Us Remember Sir Edward Coke, And Give Thanks*, The Federalist Society (June 10, 2024) ................................. 5

Chris Edwards, *State Policy Favoritism and Corruption*, Cato Inst. (Sept. 10, 2020) ........................................................................ 22

Stephanie Ferguson, *Understanding America's Labor Shortage,* U.S. Chamber of Commerce (May 13, 2024) ......................................... 12

*Freelancers predicted to become the U.S. workforce majority within a decade, with nearly 50% of millennial workers already freelancing, annual "Freelancing in America" study finds*, upwork (Oct. 17, 2017) ...................... 14

Liliana M. Garces et al., *The U.S. Supreme Court's Use of Non-Legal Sources and Amicus Curiae Briefs in* Fisher v. University of Texas*, 73 J.C. & U.L. 167 (2018) ..................................................... 25

Debi Ghate, *How Do Americans Feel About the Term "Liberty"?*, State Policy Network (Aug. 17, 2022) ........................................... 5

Ernest Goodman, *How New AB-5 Law Affects the Entertainment Industry in California*, Law Offices of Ernest Goodman ............................... 20

Patrick Henry, Statement to the Second Virginia Convention (Mar. 23, 1775), *in* Give Me Liberty or Give Me Death, Yale L. School ..................... 11

Scott Lincicome, *Taking the "Free" Out of Freelance*, Cato Inst. (Nov. 2, 2022) ........................................................ 2, 12, 15, 16

*Magna Carta Translation*, Nat'l Archives ...................................... 4

Tammy McCutcheon & Alex MacDonald, *The War on Independent Work: Why Some Regulators Want to Abolish Independent Contracting, Why They Keep Failing, & Why We Should Declare Peace*, 24 Fed. Soc. Rev. 165 (2024) ............................................................. 14, 21

John Stuart Mill, *On Liberty* (2d ed. 1859) ................................... 4

Robert H. Moorman et al., *Driving the Extra Mile in the Gig Economy: The Motivational Foundations of Gig Worker Citizenship*, 11 Annual Rev. of Organizational Psych. & Organizational Behav. 363 (2024) ................. 9, 11

Office of Advocacy, *Frequently Asked Questions About Small Businesses 2023*, U.S. Small Bus. Admin (updated June 14, 2024).....................................18

Walter Olson, *DoL's Independent Contracting Proposal Endangers Both Freedom and Prosperity*, Cato Inst. (Oct. 20, 2022)...........................................22

Liya Palagashvili et al., *Assessing the Impact of Worker Reclassification: Employment Outcomes Post–California AB5* (2024)..............................21, 22, 23

*Petition of Right, 1628* ......................................................................................... 4

Robert Shapiro & Luke Stuttgen, *The Many Ways Americans Work and The Costs of Treating Independent Contractors As Employees* (Sonecon 2022) ........................................................................................ 13, 17, 18, 19

*Small Entity Compliance Guide*, U.S. Dept. of Labor ........................................... 7

*Stronger Together; State of Independence in America 2023*, MBO Partners ....6, 11, 12, 13, 14, 15, 16

Levi Sumagaysay, *Gig companies spent more than $200 million to write their own labor law. The state Supreme Court could throw it out*, Cal Matters (May 22, 2024) .................................................................................................22

Sarah Thomason, Ken Jacobs & Sharon Jan, E*stimating the Coverage of California's New AB 5 Law*, UC Berkley Labor Center (Nov. 12, 2019) ..........20

The Declaration of Independence (U.S. 1776) ....................................................... 3

U.S. Bureau of Lab. Stat., USDL-18-0942, *Contingent and Alternative Employment Arrangements Summary* (2018) .....................................................15

*Upwork Study Finds 59 Million Americans Freelancing Amid Turbulent Labor Market*, upwork (Dec. 8, 2021)................................................................15

## Regulations

Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 84 Fed. Reg. 1638 (Jan. 10, 2024)............................6, 7, 8, 10, 11

## Constitutions

U.S. Const. pmbl...................................................................................................... 3

**INTEREST OF AMICUS CURIAE**

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute works to restrain governmental overreach at all levels of government. In fulfillment of that purpose, The Buckeye Institute files lawsuits and submits amicus briefs. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

**SUMMARY OF THE ARGUMENT**

This is a case of misguided paternalism, in which bureaucrats proceed notwithstanding the actual motivations of independent and liberty-loving Americans. The Americans who participate in the economy as independent contractors and "gig" workers do so because they enjoy it and benefit from it, not because their wills have been overborne by corporate interests. The regulatory drive to force independents and "gig" workers into employee status rests in the fact that "our political class often misunderstands—willfully or otherwise—much of the U.S. workforce." Scott Lincicome, *Taking the "Free" Out of Freelance*, Cato Inst. (Nov.

2, 2022).[1] This case presents an opportunity to remind regulators and representatives that they work for the people they represent, not vice versa. The opportunity is significant because "independent work isn't some fringe part of the American workforce." *Id*. There are many more independent workers than the regulatory community sees.

Moreover, those workers choose this form of work because they value the flexibility it gives them. Even if they earn less overall—and many actually earn more—they are happier with the combination of pay and flexibility than they would be as an employee. The attempt to force independent workers into an employment relationship is unlikely to succeed.

The Department's mission is to advance opportunities for profitable employment. Instead, the Department's new rule's unintended consequences are more likely to harm, than help, workers. Many companies will simply cancel their contracts with independents—as happened in California when it tried to force independent workers into an employment relationship. In addition, some independent workers have chosen independence because they are disabled, have family situations, or some other similar factor that precludes their full-time employment. Those vulnerable workers will be left out too.

---

[1] https://cato.org/commentary/taking-free-out-freelance.

The California experience teaches that rules forcing workers into employment arrangements harms them. Statistically, jobs are lost. Personally, lives are harmed. Federalizing California's efforts to reclassify independent workers into dependent employees is misguided.

Of course, this case is about the law, not policies. But in its quest to implement its view of a worker's paradise, the Department of Labor cut corners, acted arbitrarily and capriciously, and exceeded its statutory authority, as the Appellants explain. The court may properly contemplate the impact of the Department's errant ways.

## ARGUMENT

### I.  Introduction

Americans have long loved and valued liberty. Our country is founded on the self-evident truth that liberty is an "unalienable Right[ ]." The Declaration of Independence ¶ 2 (U.S. 1776). The Constitution declares that we formed our government to "secure the Blessings of Liberty to ourselves and to our Posterity." U.S. Const. pmbl. The fundamental principle of liberty is further enshrined in the Fifth and Fourteenth Amendments to the Constitution. And, the value of liberty has been repeatedly invoked by the U.S. Supreme Court and by the federal courts generally. *See, e.g., Arizona v. Mayorkas*, 143 S. Ct. 1312, 1315 (2023) (Jackson, J., dissenting from vacatur) (noting that courts are "bound to protect our liberties"); *Wooden v. United States*, 595 U.S. 360, 391 (2022) (Gorsuch, J., concurring in the

judgment) ("Any new national laws restricting liberty require the assent of the people's representatives . . . .). The roots of our appreciation for liberty go far deeper. As early as the Greek and Roman governments, liberty was valued as "protection against the tyranny of the political rulers." John Stuart Mill, *On Liberty* 8–9 (2d ed. 1859).[2] In Magna Carta (1215), the nobles enumerated the "customs and liberties which we have granted to be held in our realm in so far as pertains to us are to be observed by all of our realm, both clergy and laity." *Magna Carta Translation*, Nat'l Archives.[3] Indeed, Magna Carta is "the charter of the liberties of the kingdom, upon great reason, because, *liberos facit*, it makes the people free." *Hurtado v. People of State of California*, 110 U.S. 516, 542 (1884) (Harlan, J., dissenting) (internal marks quotation omitted). Subsequently, in the 1628 Petition of Right, Sir Edward Coke invoked the "rights and liberties" of the English people to be free of impositions such as forced loans to the Crown then under Charles I. *The Petition of Right, 1628*.[4]

As J. Kennerly Davis notes,

> The Petition remains in force in the United Kingdom, with standing equal to the Magna Carta and the 1689 Bill of Rights. The influence of the Petition on American constitutional law was significant. Its basic principles find expression in the Third, Fifth, Sixth, and Seventh

---

[2] https://www.google.com/books/edition/On_Liberty/GdxZAAAAcAAJ?hl=en&gbpv=1&pg=PA1&printsec=frontcover.

[3] https://www.archives.gov/exhibits/featured-documents/magna-carta/translation.html#:~:text=All%20these%20aforesaid%20customs%20and,respect%20to%20their%20own%20men (last visited June 20, 2024).

[4] https://archive.csac.history.wisc.edu/2_The_Petition_of_Right.pdf.

Amendments to the U.S. Constitution.

John Kennerly Davis, *Let Us Remember Sir Edward Coke, And Give Thanks*, The Federalist Society (June 10, 2024).[5]

Even today, Americans of every political persuasion, race, gender, ethnicity, and age highly value liberty and see it as a "core American value." *Americans, Deeply Divided, Yet Share Core Values of Equality, Liberty & Progress*, Siena College Rsch. Inst. (Oct. 25, 2021).[6] "Philanthropy for Active Civic Engagement (PACE), a philanthropy-serving organization, recently released the findings from its Civil Language Perceptions Project." Debi Ghate, *How Do Americans Feel About the Term "Liberty"?*, State Policy Network (Aug. 17, 2022).[7] "Among the civic terms tested [in a survey of 5,000 Americans of 'all persuasions and walks of life'], liberty had the second highest positive rating at 63%, with an additional 35% viewing it neutrally." *Id*.

The historical and survey evidence shows that philosophically—leaving aside economic benefit—many Americans like the idea of working independently. Certainly, some prefer the security of full-time employment, but millions like the freedom of being their own boss. Indeed, "87% of Full-Time Independents said they

---

[5] https://fedsoc.org/commentary/fedsoc-blog/let-us-remember-sir-edward-coke-and-give-thanks.

[6] https://scri.siena.edu/2021/10/25/americans-deeply-divided-yet-share-core-values-of-equality-liberty-progress/.

[7] https://spn.org/articles/how-do-americans-feel-about-the-term-liberty/.

were happier working on their own and, 78% of Full-Time Independents said working on their own is better for their health." *Stronger Together; State of Independence in America 2023*, at Healthier and Happier tab, MBO Partners ("*Stronger Together*").[8] The drive for liberty and the freedom to achieve and maintain a healthy work-life balance is limited by the Department of Labor's (Department) new rule.

Even though the Department's new 2024 rule supposedly "is not intended to disrupt the businesses of independent contractors who are, as a matter of economic reality, in business for themselves," Employee or Independent Contractor Classification Under the Fair Labor Standards Act, <u>84 Fed. Reg. 1638</u>, 1638 (Jan. 10, 2024) (2024 IC Rule), its complexity will make working independently more difficult. The 2024 IC Rule revives and expands an amorphous and previously abandoned six-factor balancing test, which looks at the "totality of the circumstances." *See id*. at 1666. The result is a fact-specific analysis—for each worker—under which "[f]acts like job titles or whether a worker receives a 1099 form are not probative of the economic realities of the relationship." *Id*. at 1669. "None of these factors is determinative on its own, and each must be considered with an eye toward the ultimate question—the worker's dependence on or independence

---

[8] https://www.mbopartners.com/state-of-independence (last visited June 20, 2024).

from the alleged employer." *Id*. (quoting *Acosta v. Off Duty Police Servs*., 915 F. 3d 1050, 1055 (6th Cir. 2019) (alterations omitted)).

The rule challenged in this case replaces the 2021 Independent Contractor Rule (2021 IC Rule) that modernized the old perplexing and arguably indecipherable six-part rule[9] and simplified the analysis to look at two key factors: 1) the nature and degree of control over the relevant work; and 2) an individual's opportunity for profit or loss. The old rule (pre-2021 IC Rule) was based on a post-WWII economy and cases decided immediately after our GI's returned from service in the European and Pacific war. The Biden Department of Labor jettisoned the 2021 modernized rule and, in a gross understatement, breezily mentioned that "the Department appreciates, as some commenters noted, that two factors (like any test with fewer factors) are simpler in some ways than six factors . . . ." *Id.* But, the 2024 IC Rule's complexity does not end with the six factors; each factor has multiple subfactors. *See id.* at 1742–743; *Small Entity Compliance Guide*, U.S. Dept. of Labor[10]. And each case is decided on a case-by-case basis; thus, preventing workers from knowing how the Department will treat them and how their tax status will be affected. *See Small Entity*

---

[9] Those already confusing six factors "are not exhaustive." 89 Fed. Reg. at 1742.

[10] https://www.dol.gov/agencies/whd/government-contracts/small-entity-compliance-guide#sixFactors.

*Compliance Guide*, *supra*.[11] Of course, this legal complexity does not disturb the vast Department with a well-staffed department of lawyers. But to the average independent contractor who is not a lawyer, does not have a lawyer on staff, and cannot afford a lawyer, simplicity is critical. The Department dismisses this business-killing effect with a wave: The "Department believes that any clarity created by shrinking the test to two core factors and artificially weighting them is completely illusory." 89 Fed. Reg. at1669. While agencies, courts, and lawyers may enjoy deciphering legal complexities, individual workers who are embarking on the dream of being their own boss have a different view. For them, the KISS principle— keep it simple stupid—is the key to success.

The Department went on to justify its reversion to the outdated pre-2021 rule based on cases like *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), and *United States v. Silk*, 331 U.S. 704 (1947), decided more than 70 years before the boom in independent contracting, the "gig" economy, and all of the technological innovations that allow individuals to be their own bosses. "The advent of the

---

[11] "No one factor or subset of factors determines if a worker is an employee or independent contractor. Rather, all the circumstances of the relationship should be examined. The weight given to each factor may depend on the facts and circumstances of the particular relationship. Also, additional factors may be relevant if they in some way indicate if the worker is in business for themselves as opposed to being economically dependent on the employer for work." *Id*. This is hardly comforting guidance to the entrepreneur who is a specialist in his or her profession, not in employment law.

smartphone and the complementary technological advancement have reshaped the commercial landscape, providing consumers new ways to access the retail marketplace and providing workers with easy access to a new source of flexible work opportunities." John M. Berrios, Yoel V. Hochberg & Hanyi Yi, *Launching with a parachute: The gig economy and new business formation*, 144 J. Fin. Econ. 22, 25 (2022). Technology has created low barriers to entry to "allow gig work to substitute for other employment in down states of the world or to provide supplemental income opportunities." *Id.* at 26. Consequently, "[o]ver the last decade, the demand for alternative work arrangements has significantly increased. . . . [W]e are now in a new age in which companies and workers are no longer limited to a standard employment contract." Robert H. Moorman et al., *Driving the Extra Mile in the Gig Economy: The Motivational Foundations of Gig Worker Citizenship*, 11 Annual Rev. of Organizational Psych. & Organizational Behav. 363, 364 (2024) (citation omitted). No longer need workers toil for companies they perceive to be "monolithic and overbearing corporate overlords." However, "the idealized intentions of gig work have diminished as new work arrangements have run up against established work traditions." *Id.* The Department of Labor is that establishment. The Department's rule is a roadblock to this innovation and change—and not to the benefit of workers.

## II. The 2024 IC Rule ignores the liberty interest of independent workers.

The Department evaluates its new rule based on economic costs and benefits to the economy. It focuses on the macro-economic benefits and costs. But it gives barely a thought as to the deeply held value of liberty. Indeed, the 2024 IC Rule and the response to the comments do not use the word "liberty" at all and they consider the term "freedom" only in the very narrow concept of a worker's freedom to schedule his or her working hours. But the Department quickly denigrates even that interest: "[S]cheduling flexibility may be a relatively *minor* freedom." 87 Fed. Reg. at 1697 (emphasis added) (citing *Verma v. 3001 Castor, Inc*., 937 F.3d 221 (3d Cir. 2019)). But the cited case says no such thing—at all. Even the Department's Federal Register statement is seemingly limited to "those cases where a worker is prevented from exercising true flexibility because of the pace or timing of work or because the employer maintains other forms of control, such as the ability to punish workers who may seek to exercise flexibility on the job." *Id*. But workers' liberty interests are much broader. Those interests include the more valuable kind of freedom or liberty—the core value of liberty for liberty's sake. Patrick Henry did not declare "Give me liberty or give me death" to obtain wealth—he expressed the desire to be free from government control and coercion. *See* Patrick Henry, Statement to the Second Virginia Convention (Mar. 23, 1775), *in* Give Me Liberty or Give Me Death,

Yale L. School.[12] The same applies to the ability to run one's life without an employer dictating the details of one's work life.

> [G]ig work [is] "a new kind of work experience . . . that offer[s] freedom—the chance to control one's destiny. No boss. Work when you want, as you want." . . . [T]he ideal of gig work and of the sharing economy was that "it [is] about more than money. It [is] also a social project, a chance to remake work and build a humane alternative to global capitalism."

Moorman et al, *supra*, at 364 (citation and original alternation marks omitted). Yet, the Department gave no consideration at all to this value—simply because it cannot be quantified in dollars and cents.

Indeed, with new technological developments and lower barriers to entry, the number of new businesses as sole proprietorships has exploded. The Department's representation that "[t]here is no evidence that the status quo prior to the 2021 IC Rule was hindering the use of independent contractors," 87 Fed. Reg. 1658, is incorrect. Indeed, "[t]he last several years have seen a significant increase in the number of Occasional Independents, from 15.8 million in 2020 to 36.6 million in 2023-an increase of 130% in three years." *Stronger Together*, *supra*, at Healthier and Happier tab. And "[t]he number of Full-Time Independents has also significantly grown, increasing by 20% in 2023, reaching 26 million. The growth since prior to the pandemic is even greater, up 73% since 2019." *Id*. Comparing this to the growth

---

[12] https://avalon.law.yale.edu/18th_century/patrick.asp (last visited June 21, 2024).

in that segment to growth before the 2021 IC Rule of "just 2% between 2011 and 2019" shows the effectiveness of the 2021 IC Rule in creating more jobs compared to the prior (and now reimposed) confusing six-factor test. *See id*.

The American entrepreneurial spirit should not be squashed. Many workers want the security of a job where they are an "employee." But,

> [t]o a degree, independent workers are simply wired differently. Working independently feeds an increasingly powerful impulse among people who want to be their own boss. In 2023, 80% of independent workers said they always wanted to be their own boss, and some 71% of independent workers say they don't like answering to a boss.

*Id*. The Department of Labor does not value this attitude—it dismisses it.

## III. Workers also want to work independently to obtain flexibility and economic benefits.

The regulatory impulse to choose independent work

> makes sense if you think, as many in Washington seem to do, that independent work in the United States is primarily about a handful of poor gig workers forced to toil as contractors by a nefarious employer abusing his market power to save a few bucks on taxes/benefits and to avoid various labor regulations.

Lincicome, *supra*. The reality is far different.

While there have been reports of recent labor shortages (triggered partly by the pandemic), Stephanie Ferguson, *Understanding America's Labor Shortage,* U.S. Chamber of Commerce (May 13, 2024)[13], at least in the measured period of 2007 to

---

[13] https://www.uschamber.com/workforce/independent-contractors/new-research-exposes-flaws-in-californias-independent-contractor-law.

2019, "the supply of labor [ ] outpaced demand by business." Robert Shapiro & Luke Stuttgen, *The Many Ways Americans Work and The Costs of Treating Independent Contractors As Employees* 10 (Sonecon 2022).[14] Between 2007 and 2019, "[t]he number of working-age Americans with college degrees or a record of having attended colleges increased substantially more than demand, based on actual employment, while the number of working-age people with high school diplomas or less declined less than the number of employed people with that education." *Id*. at 10–11 and Table 3A. Those results are reflected in the ratio of employment to population. *Id*. at 11 and Table 3B.

This labor mismatch "provid[ed] [ ] economic conditions for growth in independent contracting, and especially gig and temporary workers." *Id*. at 11. COVID-19 contributed to the overall trend, "especially among less-skilled workers who fill many gig and temporary positions." *Id*.

The number of independent and "gig" workers is far greater than the regulators believe. In 2023, independent workers represented about 45% of the nation's workforce, some 72.1 million people. *Stronger Together*, *supra*. That number is composed of people from every age cohort, from baby boomers through Gen X and Millennials to Gen Z. *Id*. And, as baby boomers age out of work, the number of

---

[14] https://progresschamber.org/wp-content/uploads/2022/04/The-Many-Ways-Americans-Work-Chamber-of-Progress-Shapiro-Sonecon.pdf.

independent workers from other age cohorts is likely to increase. *Id*. And, the freelance platform Upwork has projected that—by 2027—the majority of the American workforce would be doing independent work. *Freelancers predicted to become the U.S. workforce majority within a decade, with nearly 50% of millennial workers already freelancing, annual "Freelancing in America" study finds*, upwork (Oct. 17, 2017) ("*Freelancing in America*").[15]

Independent workers fit into every demographic category. "Between 2019 and 2022, the proportion of white independents fell while the proportion of minorities rose to 25%." Tammy McCutcheon & Alex MacDonald, *The War on Independent Work: Why Some Regulators Want to Abolish Independent Contracting, Why They Keep Failing, & Why We Should Declare Peace*, 24 Fed. Soc. Rev. 165, 169–70 (2024). The millions of people who want to work independently "are both high income and low, 50% are women, 49% are Millennials or Gen Z, and 25% are minorities." *Id*. at 191; see also *Stronger Together*, *supra* (Millennials and Gen Z total 49% of independent workers in 2022, 42% in 2023).

Independent workers also frequently work in white-collar jobs rather than as rideshare Uber or Lyft drivers or making DoorDash deliveries. "53% of all freelancers provided skilled services such as computer programming, marketing, IT,

---

[15]https://www.upwork.com/press/releases/freelancing-in-america-2017.

and business consulting in 2021, up from 50% in 2020." *Upwork Study Finds 59 Million Americans Freelancing Amid Turbulent Labor Market*, upwork (Dec. 8, 2021).[16] Freelance jobs that showed large spikes in demand in the 3rd quarter of 2022 included app development for Android devices, computer programming, blog writing, and generating YouTube content. Lincicome, *supra*.

Many independent workers choose self-employment to maximize their flexibility. In 2023, 63% of independent workers said that it was their choice entirely to work on their own, and only a handful said that working independently resulted from a response to factors beyond their control. *Stronger Together*, *supra*. Seventy percent of independent workers say that "flexibility is more important than making the most money." *Id*. By a large margin, they say they like being their own boss (80%) and do not want to answer to a boss (71%). *Id.*; see also U.S. Bureau of Lab. Stat., USDL-18-0942, *Contingent and Alternative Employment Arrangements Summary* (2018) (79% of independent workers preferred their independent status to having a "traditional job").[17]

The notion that independent workers lack access to standard employee benefits like health insurance or a retirement account is unsupported. Independent workers frequently have access to health care or retirement accounts through a spouse or

---

[16] https://investors.upwork.com/news-releases/news-release-details/upwork-study-finds-59-million-americans-freelancing-amid.

[17] https://www.bls.gov/news.release/conemp.nr0.htm.

individual markets. Lincicome, *supra*, at Figure 4.

MBO Partners attributes the growth in the number of independent workers to increased demand for such workers and to the development of technology that enables independent work. *Stronger Together*, *supra*. On the demand side, "companies are becoming more careful and focused about adding headcount." *Id*. Independent workers help fill that need, and when they do, they can compensate for the "inflation and underlying economic insecurity [that] are pushing more people to pursue side gigs as ways to augment income." *Id*. Finally, "[h]iring platforms and collaboration technologies make it easier for companies to find, manage, and work with independents. Talent platforms and the ability to work remotely are making it easier to earn a good living as an independent." *Id*.

But in addition to flexibility and independence, many hope to improve their finances. Contrary to common perception, independent contractors are not just low-paid jobs like Uber, DoorDash, freelance writers, and house cleaners. Because of changes in the economy, technology, and worker innovation, 53% of independent contractors report earning more as full-time independents than as employees. Indeed, in 2023, there were 4.6 million over $100K independent earners. *Stronger Together*, *supra*, at Happier and Healthier tab. That number has grown steadily from 1.9 million in 2011. And, starting in 2021 when the 2021 IC Rule was promulgated, that number exploded from 3.0 million over $100K earners in 2020 to 4.6 million over

$100K earners in 2023—an astonishing 53% increase in only three years.

## IV. The Department of Labor's rule will harm the workers it is supposed to help.

The U.S. Department of Labor's mission is "[t]o foster, promote, and develop the welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights." *About Us*, U.S. Dept. of Labor.[18] The 2024 IC Rule does the opposite. In its quest to force independent workers to become employees, the Department will harm the very workers it is supposed to protect. The economics of reclassifying independent contractors as employees will likely produce net job losses and foregone earnings. The California experience with converting independent workers into employees demonstrates this harm.

Advocates of the six-factor test recognize that it will change the categorization of millions of independent workers into employees. But that does not mean that all of those workers will continue working. "[S]ome share of independent workers will not be hired as regular employees merely because a government test held that their work can no longer be classified as independent contracting." Shapiro & Stuttgen, *supra*, at 19. Economics limits the number of independent workers that companies would hire if those independent workers were reclassified as employees. Shapiro

---

[18]https://www.dol.gov/general/aboutdol#:~:text=Our%20Mission,work%2Drelated %20benefits%20and%20rights (last visited June 21, 2024).

and Stuttgen point out that companies that use independent workers save on both labor costs and non-wage benefits. *Id.* at 2–3. Those savings would disappear for every independent contractor who is hired as an employee. Some regulators expect that all of these independent workers will be rehired as employees by large companies who are perceived to have nearly unlimited resources or the ability to pass along costs to customers. This is wrong.

First, even large companies are there to make a profit, and hiring more employees does not necessarily result in higher profits. But second, 46.6% of employees work for small businesses—which have much more limited resources than large companies. *See* Office of Advocacy, *Frequently Asked Questions About Small Businesses 2023*, U.S. Small Bus. Admin (updated June 14, 2024).[19]

Shapiro and Stuttgen explain that the measure of corporate rehiring turns on the state of the economy and overall labor demand. Shapiro & Stuttgen, *supra*, at 6. They "estimate that following nationwide involuntary reclassification, the share of those potential employees who would not be rehired as regular employees would be about 30 percent during a boom, 43 percent during normal times, and 65 percent during a downturn." *Id*. The result of such a nationwide involuntary reclassification

---

[19] https://advocacy.sba.gov/2023/03/07/frequently-asked-questions-about-small-business-2023/#:~:text=There%20are%2033%2C185%2C550%20small%20businesses,46.4%25%20of%20private%20sector%20employees.

"would likely lead to substantial net income and job losses." *Id*. at 7. The estimated costs and job losses are net earnings losses of $42.1 billion and 3.43 million lost jobs in normal times, $35.2 billion and 3.0 million in boom times, and $55.0 billion and 3.81 million lost jobs during a downturn. *Id*.

Those results do not turn solely on cost. A significant number of independent workers who have made that choice "would be unable to work as permanent employees for reasons of disability, chronic illness, or family responsibilities." *Id*. at 4; see also *id*. at 6 ("Some 46 percent of independent contractors choose the work because disabilities, chronic illness, or family obligations prevent them from working in a traditional office, factory, or other facility."). Their doing so "enable[s] them to be productive and self-supporting." *Id*. at 13. Those independent workers—society's most vulnerable—"would lose their livelihoods." *Id*. at 4. They would fall into a legal Bermuda Triangle, lost in a sea of legal confusion and bureaucratic restrictions created by the 2024 IC Rule.

Moreover, the loss of independent workers would result in foregone economic benefits. Several scholars have concluded, "[T]he introduction of the gig economy [in the form of Uber and Lyft drivers] creates fallback opportunities for would-be entrepreneurs that reduce risks and encourage new business formations." Berrios et al., *supra*. They found a 4–6% increase in realized business incorporations and in small business lending to newly registered businesses after the ride-hailing gig

economy arrived. *Id*. In addition, they found an increase of 7–12% in entrepreneurial interest as ride-hailing services come to a city offering ride-hailing opportunities. *Id*.

The California experience shows the harmful impact of forcing independents into the employment category. In 2018, the California State Supreme Court imposed a new independent contractor test forcing this conversion for millions of workers. *Dynamex Operations West Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018). The court adopted a variance of the so-called ABC test.

> Under the ABC test, a business can only contract with a worker as an independent contractor if the work performed a) is under the worker's control and not that of the business, b) is not part of the company's core business, and c) is part of the worker's independent profession.

Sarah Thomason, Ken Jacobs & Sharon Jan, E*stimating the Coverage of California's New AB 5 Law*, UC Berkley Labor Center (Nov. 12, 2019).[20] California codified the ABC test through AB 5. "Under AB 5, *workers are assumed to be employees* unless all three conditions of the ABC test are met . . . ." *Id*. (emphasis added). AB 5 was anticipated to "reclassify approximately 2,500,000 workers previously deemed independent contractors as employees." Ernest Goodman, *How New AB-5 Law Affects the Entertainment Industry in California*, Law Offices of Ernest Goodman.[21]

---

[20] https://laborcenter.berkeley.edu/estimating-the-coverage-of-californias-new-ab-5-law/#_edn3.

[21] https://ernestgoodmanlawfirm.com/how-new-ab-5-law-affects-the-entertainment-industry-in-california/#respond (last visited June 21, 2024).

But in California, not all workers are equal, some are more equal than others. Those with good lobbyists successfully evaded the law's impact. "AB5 exempted 57 industries and occupations from the new law, such as architects, doctors, and lawyers." Liya Palagashvili et al., *Assessing the Impact of Worker Reclassification: Employment Outcomes Post–California AB5* 3 (2024).[22] As it turned out, the new law harmed rather than helped workers. In fact, it totally backfired—it was a mess. As a result, in September 2020, the California legislature enacted AB2257, which exempted an additional 52 occupations from the new law, such as musicians, writers, editors, and translators. Those categories carved out included "app-based dog walkers, handymen, and newspaper delivery people." McCutchen & MacDonald, *supra*, at 191. AB 2257 "made changes for freelance writers and photographers, including dropping a much-criticized limit on annual submissions." *Id*. at 182. Other carveouts included "songwriters, radio promoters, landscape artists, home inspectors, [and] professional foresters . . . ." *Id.* There were a few unlucky industries that did not have good enough lobbyists to get the benefits of the exemptions. Indeed, "[l]aws, such as [AB 5], that impose unequal justice generate endless lobbying, litigation, campaign contributions, and corruption as companies and labor unions jockeying for special treatment from politicians." Chris Edwards, *State Policy*

---

[22] https://www.mercatus.org/research/working-papers/assessing-impact-worker-reclassification-employment-outcomes-post.

*Favoritism and Corruption*, Cato Inst. (Sept. 10, 2020).[23]

Next, in November 2020, California voters passed Proposition 22—a ballot measure that exempted platform-based transportation and delivery workers from AB5. *See* Levi Sumagaysay, *Gig companies spent more than $200 million to write their own labor law. The state Supreme Court could throw it out*, Cal Matters (May 22, 2024).[24] Walter Olson observed, "While media coverage of the issue tend to focus on platform-based gig-workers, workers hurt by AB 5 included many tutors, performers in music and theater, plumbers, nurse practitioners, writers, photographers, contract software developers, and many others, including, owner-operators and other independent  truckers." Walter Olson, *DoL's Independent Contracting Proposal Endangers Both Freedom and Prosperity*, Cato Inst. (Oct. 20, 2022).[25]

In January of 2024, the Mercatus Center at George Mason University undertook "the first empirical assessment of the employment effects of AB5." Palagashvili et al., *supra*. Contrary to the hopes of the California government, the study found that AB 5 did not result in businesses reclassifying their independent contractors as

---

[23] https://www.cato.org/blog/state-policy-favoritism-corruption.

[24] https://calmatters.org/economy/2024/05/prop-22-oral-arguments/#:~:text=Four%20years%20ago%2C%20voters%20approved,delivery%20workers%20as%20independent%20contractors.

[25] https://www.cato.org/blog/dols-independent-contracting-proposal-endangers-both-freedom-economic-health.

traditional employees to meet the law's requirements. *Id.* at 5. Instead, the researchers concluded that "AB5 is significantly associated with a decline in self-employment and overall employment." *Id.* Specifically, they found that among full-time self-employed workers, "reclassification reduced the level of employment by 8.1 percent," and "worker reclassification also decreased the level of part-time self-employment by 4.6 percent . . . ." *Id.* at 12–13. Surprisingly, the new law also reduced traditional employment. *Id.*

But this is not just a story of statistics—it is a story of pain and fear. A million jobs lost is a statistic; one person's lost job—and its fallout—is a tragedy. Will Griffith is just one of the many who lost his independent contracting job, in his case as a freelance worker for Vox Media. When the 2019 AB 5 law became effective, the Vox Media website had to let go of more than 200 freelance writers. Allana Akhtar, *'It feels cold and heartless': Hundreds of California freelancers have been fired before the holidays over a state law meant to help Uber and Lyft drivers*, Business Insider (Dec. 18, 2019).[26] While "many labor experts praised the law for prohibiting companies from using freelance workers without giving them benefits like healthcare," Griffith was anything but overjoyed when he lost his job as a freelance writer. While Griffith blamed Vox, it was simply a consequence of California's

---

[26] https://www.businessinsider.com/california-ab5-bill-left-freelancers-out-of-work-2019-12.

misguided effort to "help." Then there was Michelle:

> Michelle Mista worked as a freelance writer for the past decade, starting
> after she gave birth to her daughter. During her time freelancing, Mista
> developed an autoimmune disease.
>
> Her chronic illness makes it hard for Mista to work certain jobs; her last
> full-time job was in desktop support, which requires workers to be on
> their feet. Mista said she ran the risk of getting tired and not being able
> to care for her daughter without a full-time desk job.
>
> "Looking at my health, not being able to rest or modify my activities as
> I need is going to have an impact on my work and contribute to pain,"
> Mista said. "It's just going to upend everything my family has planned."

*Id*. There are an untold number of other personal tragedies the California law caused.

In the end, people want the freedom to work as they please. Forcing them into

employment situations they have rejected hurts, not helps them.

Contrasting the national growth of successful independent contractor

entrepreneurs—the "gig" economy—from 2020 to now, to the failure of the

California experiment demonstrates the benefits of individual liberty. Workers today

thrive when allowed to pursue their dreams as independent contractors. In its quest

to impose the employee stamp on more and more workers, the Department has

forgotten its mission. The Department best helps workers by helping them find

worker opportunities they want and where they best succeed, not by imposing the

Department's preferred label.

Of course, this case is about the law and the fact that the Department did not

follow the law when it imposed its counterproductive new regulation, which

reversed the very productive 2021 IC Rule. The foregoing analysis suggests that the Department was so intent on implementing its own predilections of how to "help" workers that it took shortcuts in promulgating the 2024 IC Rule. And as the Court considers the legality of the rule, it may recognize that the foregoing analysis properly "inform[s] the [Court's APA] jurisprudence . . . ." Liliana M. Garces et al., *The U.S. Supreme Court's Use of Non-Legal Sources and Amicus Curiae Briefs in Fisher v. University of Texas*, 73 J.C. & U.L. 167, 170 (2018).

## CONCLUSION

For the foregoing reasons, the judgment of the U.S. District Court should be reversed, and the operation of the Department of Labor's rule enjoined.

Respectfully submitted,

*/s/* Jay R. Carson

Jay R. Carson                                John J. Park Jr.
  *Counsel of Record*                      P.O. Box 3073
David C. Tryon                             Gainesville, GA 30503
Alex M. Certo                              (678) 608-1920
The Buckeye Institute                      (m) 703-888-8329
88 East Broad Street                       jackparklaw@gmail.com
Suite 1300
Columbus, OH 43215
(614) 224-4422
J.Carson@BuckeyeInstitute.org

*Attorneys for amicus curiae*

June 24, 2024

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,572 words.

2. This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman.

 /s/ Jay R. Carson
Jay R. Carson
*Attorney of record for*
*amicus curiae*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing amicus brief

was served on all counsel of record via the Court's electronic filing system this

25th day of June 2024.

Respectfully submitted,

 /s/ *Jay R. Carson*
Jay R. Carson
*Attorney of record for
amicus curiae*