No. 24-30223

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

FRISARD'S TRANSPORTATION, L.L.C.; LOUISIANA MOTOR
TRANSPORT ASSOCIATION, INCORPORATED; A & B GROUP,
INCORPORATED; TRIPLE G EXPRESS, INCORPORATED;
NORTHLAKE MOVING AND STORAGE, INCORPORATED,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, Acting
Secretary, U.S. Department of Labor; JESSICA LOOMAN, in her
official capacity as Administrator of the Wage and Hour Division;
UNITED STATES DEPARTMENT OF LABOR, WAGE, AND HOUR
DIVISION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA

BRIEF OF ECONOMIC POLICY INSTITUTE, FARMWORKER
JUSTICE, PUBLIC JUSTICE CENTER, REAL WOMEN IN
TRUCKING, RESTAURANT OPPORTUNITY CENTERS UNITED,
AND SERVICE EMPLOYEES INTERNATIONAL UNION IN
SUPPORT OF DEFENDANTS-APPELLEES

MARK B. SAMBURG
  *Counsel of Record*
ROBIN THURSTON
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

msamburg@democracyforward.org

# CERTIFICATE OF INTERESTED PERSONS

No. 24-30223, *Frisard's Transportation, L.L.C. et al. v. United States Department of Labor et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

> Economic Policy Institute
> Farmworker Justice
> Public Justice Center
> REAL Women in Trucking
> Restaurant Opportunity Centers United
> Service Employees International Union
> Democracy Forward Foundation
> Mark B. Samburg
> Robin Thurston

**Plaintiffs-Appellants and Counsel**

Frisard's Transportation, L.L.C.
Louisiana Motor Transport Association, Incorporated
A & B Group, Incorporated
Triple G Express, Incorporated
Northlake Moving and Storage, Incorporated
James Stuart Baehr
Sarah Harbison
M.E. Buck Dougherty III
Reilly Stephens
Pelican Center for Justice
Liberty Justice Center

**Defendants-Appellees and Counsel**

United States Department of Labor
Julie A. Su
Jessica Looman
United States Department of Labor, Wage and Hour Division
Brian M. Boynton
Duane A. Evans
Jennifer L. Utrecht
Alisa Beth Klein
Lisa A. Olson
Michael S. Raab
Joseph Forrest Busa
Seema Nanda

**Other Amici Curiae**

The Buckeye Institute
Americans for Fair Treatment
Manhattan Institute
Institute for the American Worker
Chamber of Commerce of the United States of America
Coalition for Workforce Innovation
Associated Builders and Contractors, Incorporated
Associated Builders and Contractors of Southeast Texas, Incorporated
National Federation of Independent Business, Incorporated
National Retail Federation
American Trucking Associations
Financial Services Institute, Incorporated

**Counsel for Amici Curiae**

Manhattan Institute
    Ilya Shapiro

Liff Walsh & Simmons
    David R. Dorey

Littler Mendelson, P.C.
    Maurice Baskin

Gibson, Dunn & Crutcher LLP
    Eugene Scalia                 Jason J. Mendro
    Andrew G.I. Kilberg

U.S. Chamber Litigation Center
    Stephanie A. Maloney        Jordan L. Von Bokern

The Buckeye Institute
    Jay R. Carson                David C. Tryon
    Alex M. Certo

John J. Park Jr.

Undersigned counsel is not aware of any other persons or entities who have an interest in the outcome of this case.

Pursuant to Fed. R. App. P. 26.1, *amici* Economic Policy Institute, Farmworker Justice, Public Justice Center, REAL Women in Trucking, Restaurant Opportunity Centers United, and Service Employees International Union have no parent corporation and no publicly held corporation owns 10% or more of the stock of any *amicus*.

Dated: August 23, 2024           Respectfully submitted,

                            */s/Mark B. Samburg*
                            Mark B. Samburg
                            Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF CONTENTS .................................................................iv

TABLE OF AUTHORITIES................................................................v

INTEREST OF AMICI CURIAE.......................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................5

ARGUMENT ...............................................................................8

    I.   The Rule will reduce the number of employees being misclassified as independent contractors. .................................................8

        a.   The Rule will prevent widespread misclassification of home care workers. ....................................................................9

        b.   The Rule will reduce the misclassification of farmworkers on the basis of seasonal employment. .........................................11

        c.   The Rule will prevent continued misclassification of app-based delivery drivers, especially on the basis of a misunderstanding of their capital investment and the degree of their control of their work. ....................................................................15

        d.   The Rule will limit pervasive misclassification of truck drivers…. ...................................................................18

    II.   Misclassification has real and devastating consequences, regardless of the industry in which the misclassified workers are employed. ...................................................................23

        a.   Misclassification results in widespread wage theft and other harms to workers. ....................................................23

        b.   Misclassification has negative effects beyond misclassified workers. ....................................................................30

CONCLUSION ...........................................................................31

CERTIFICATE OF SERVICE..........................................................33

CERTIFICATE OF COMPLIANCE....................................................34

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Castillo v. Givens*, 704 F.2d 181 (5th Cir. 1983) ..................................... 12

*Cavazos v. Foster*, 822 F.Supp. 438 (W.D. Mich. 1993) .......................... 13

*Cinagro Farms, Inc.*, 48 A.L.R.B. No. 2 (2022) ....................................... 14

*Donovan v. Gillmor*, 535 F.Supp. 154 (N.D. Ohio 1982) ....................... 12

*Perez v. D. Howes, LLC*, 790 F.3d 681 (mem.) (6th Cir. 2015) .............. 14

*Perez v. Howes*, 7 F. Supp. 3d 715 (W.D. Mich. 2014) ........................... 14

*Razak v. Uber Techs., Inc.*, 951 F.3d 137 (3rd Cir. 2020) ...................... 17

*Secretary of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987) ............. 13

**Statutes**

29 U.S.C. § 215(a)(3) ............................................................................... 28

**Other Authorities**

"Employee or Independent Contractor Classification Under the Fair
    Labor Standards Act" Rule, 89 Fed. Reg. 1638 (Jan. 10, 2024) (to be
    codified at 29 C.F.R. pts. 780, 788, 795 .... 1, 6, 7, 10, 13, 16, 17, 19, 21,
    26, 30

Bailee Peters, Nebraska Farm Bus., Inc., *Agricultural Employees vs.
    Independent Contractors* (June 2019), https://tinyurl.com/mu2s4j8f
    ..................................................................................... ...15

Brett Murphy, *Rigged: Forced into Debt. Worked Past Exhaustion. Left
    with Nothing.*, USA Today (June 16, 2017),
    https://tinyurl.com/mrxe5aj4 ....................................................... 26, 29

Chris Benner, UC Santa Cruz Inst. for Soc. Transformation, *On-Demand and On-the-edge: Ride-hailing and delivery workers in San Francisco* (Oct. 16, 2020), https://tinyurl.com/3p85tr3j ...................... 25

David J. Rodwin, *Independent Contractor Misclassification Is Making Everything Worse: The Experience of Home Care Workers in Maryland*, 14 St. Louis Univ. J. of Health L. & Pol'y 47 (2020), https://tinyurl.com/bdf2nbf5 .......................................................... 10, 11

Dep't of Lab., *Cultivating Compliance: An Agricultural Guide to Federal Labor Law*, https://tinyurl.com/2vpk9rje ........................................... 28

Dep't of Lab., *Federal Court Requires Pennsylvania Home Healthcare Agency to Pay $293K in Back Wages, Damages to 75 Workers Denied Overtime* (Aug. 22, 2022), https://tinyurl.com/2nacuaa4 ..................... 11

Dep't of Lab., *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Feb. 2000), https://tinyurl.com/bdhzc5ud .............................................................. 31

Dep't of Lab., *US Department of Labor Recovers More Than $358K in Back Wages for 50 Workers at Tennessee Home Healthcare Service* (Apr. 20, 2021), https://tinyurl.com/mpdmurve ................................... 10

Econ. Pol'y Inst. (EPI), Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standard Act (Dec 13, 2022), https://tinyurl.com/yydh878p ..................................... 2, 8, 25, 29

Eric Leverage & Samantha Dalal, Colorado Jobs with Justice, *The Gig Gap: The Reality of Denver Gig Workers 2022 Report* (Oct. 2022), https://tinyurl.com/uk29dppz ................................................. 18, 25, 31

Farmworker Just., Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/2t2ty9jn ........................................... 1, 15

Hum. Rts. Watch, *Cultivating Fear: The Vulnerability of Immigrant Farmworkers in the U.S. to Sexual Violence and Sexual Harassment* (2012), https://tinyurl.com/4puczd4u ............................................. 13, 28

Jennifer Cheeseman Day & Andrew W. Hait, U.S. Census Bureau, *America Keeps on Truckin'* (June 6, 2019), https://tinyurl.com/ybtrup77 ............................................................. 18

John Schmitt et al., *The economic costs of worker misclassification*, Econ. Pol'y Inst. (Jan. 25, 2023), https://tinyurl.com/5n7yzm7a ......... 26

Maria Figueroa et al., Los Deliveristas Unidos, *Essential but Unprotected: App-based Food Couriers in New York City* (2021), https://tinyurl.com/3z2y3bby ............................................................. 15

Nat. Empl. L. Project, *Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries* (Oct. 2020), https://tinyurl.com/5ecayeej. .............................................................. 30

Nat'l Domestic Workers All., Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 7, 2022), https://tinyurl.com/52dcmd5j............... 11

Nat'l Emp. L. Project, *Independent Contractor Classification in Home Care* (2015), https://tinyurl.com/3yh79teh .................................... 10, 25

PHI Nat'l, *U.S. Home Care Workers: Key Facts* (2019), https://tinyurl.com/f6aeuan2 .................................................................. 9

PHI, *Workforce Data Center* (last visited Aug. 20, 2024),https://tinyurl.com/yfc2kjvr ........................................................ 24

PHI, *Workforce Data Center* (last visited May 28, 2024) https://tinyurl.com/y4cwzax7 .............................................................. 24

Pub. Just. Ctr., Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/4tms25xz .......................................... 1, 27

Ratna Sinroja, et al., *Misclassification in California: A Snapshot of the Janitorial Services, Construction, and Trucking Industries*, U.C. Berkeley Lab. Ctr. (Mar. 11, 2019), https://tinyurl.com/bddx7y2k. .... 22

REAL Women in Trucking, Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/mr34n7z6 .. 1, 19, 20

Rebecca Smith et al., Nat'l Emp. L. Project, *The Big Rig: Poverty, Pollution, and the Misclassification of Truck Drivers at American Ports* (Dec. 8, 2010), https://tinyurl.com/dhawfyfy ................. 19, 23, 29

Rest. Opportunity Ctrs. (ROC) United, Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/2t693nmj ............... 1

Risa Gelles-Watnick & Monica Anderson, *Racial and ethnic differences stand out in the U.S. gig workforce*, Pew Rsch. Ctr. (Dec. 15, 2021), https://tinyurl.com/3wwf4w7m ........................................... 18

*See, e.g.,* Iowa St. Univ. Extension and Outreach, *Risk Management Practices: Avoid Employment Pitfalls on the Dairy Farm* (reviewed Feb. 2024), https://tinyurl.com/3s5fxye5 ............................................. 15

Serv. Emps. Int'l Union (SEIU), Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/2xbn77cj 2, 8, 26, 29

Tax Outreach Ctr., *How Do Food Delivery Couriers Pay Taxes*, https://tinyurl.com/3f8e97wf ............................................................... 16

Tex. Rio Grande Legal Aid, Comment Letter on Independent Contractor Status Under the Fair Labor Standards Act (Oct. 26, 2020), https://tinyurl.com/bduvd65r ........................................................ 12, 14

*The Misclassification of Workers as Independent Contractors: What Policies and Practices Best Protect Workers?: Hearing Before the Subcommittee on Workforce Protections, Committee on Education and Labor*, 110th Cong. (2007), https://tinyurl.com/5n7yenud ................... 14

U.S. Census Bureau, *Poverty Threshold for 2022 by Size of Family and Number of Related Children Under 18 Years* (last accessed May 28, 2024), https://tinyurl.com/4pte9p9b .................................................... 24

U.S. Gov't Accountability Off., GAO-09-717, *Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention* (2009), https://tinyurl.com/577zbnaj .......... 30

## INTEREST OF AMICI CURIAE[1]

*Amici* are six organizations that advocate for millions of hard-working Americans across multiple sectors, all rife with worker misclassification. Each *amicus* knows first-hand the importance of proper classification of workers as employees, and each submitted detailed comments to the Department of Labor for consideration in connection with the January 10, 2024 finalization of the Department of Labor's Rule, Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1638 (Jan. 10, 2024) (to be codified at 29 C.F.R. pts. 780, 788, 795 ("the Rule").[2] *Amici*'s

---

[1] Plaintiffs-Appellants consent to, and Defendants-Appellees do not object to, the filing of this brief. No counsel for any party authored this brief in whole or in part. No party, party's counsel, or any person other than *amici*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

[2] *See* Pub. Just. Ctr., Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/4tms25xz; Farmworker Just., Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/2t2ty9jn; Rest. Opportunity Ctrs. (ROC) United, Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/2t693nmj; REAL Women in Trucking, Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act (Dec. 13, 2022), https://tinyurl.com/mr34n7z6; Serv. Emps. Int'l Union (SEIU), Comment Letter on Employee or Independent Contractor Classification

submissions were carefully considered by the Department, and are discussed and referenced extensively in the Final Rule.

*Amicus* Public Justice Center (PJC) is a nonprofit civil rights and anti-poverty legal services organization. Founded in 1985, PJC seeks to advance social justice, economic and racial equity, and fundamental human rights in Maryland. PJC's Workplace Justice Project aims to ensure that Maryland's low-wage workers receive fair and full payment for their labor, as well as other basic protections on the job. PJC has extensive experience representing Maryland home care workers.

*Amicus* Farmworker Justice is a nonprofit organization that serves farmworkers, their families, and their communities across the United States to improve living and working conditions, immigration status, health, occupational safety, and access to justice. In particular, Farmworker Justice works to equip farmworkers with the tools to seek high wages and better working conditions, end the selective exclusion of agricultural workers from certain labor law protections, and demand

---

under the Fair Labor Standards Act (Dec. 13, 2022),
https://tinyurl.com/2xbn77cj; Econ. Pol'y Inst. (EPI), Comment Letter on
Employee or Independent Contractor Classification under the Fair
Labor Standard Act (Dec 13, 2022), https://tinyurl.com/yydh878p.

effective enforcement of labor laws, so that farmworkers have the same workplace rights as in other occupations and can exercise them without retaliation.

*Amicus* Restaurant Opportunity Centers (ROC) United is a national organization powered by local chapters throughout the United States. ROC United serves and represents all workers in the industry, covering traditional back and front-of-house workers in fine dining, combined food prep and service workers in quick service restaurants, and the fast-growing segment of app-based delivery drivers.

*Amicus* REAL Women in Trucking is a non-profit member-based organization formed by seasoned female commercial-motor-vehicle drivers who saw the need for authentic representation for women in the trucking industry. The organization works to encourage ethical corporate business practices and improved industry standards, including compensating workers for all work performed, and treating people of all genders equally when it comes to hiring, training, paying, and promoting drivers.

*Amicus* Service Employees International Union (SEIU) is a labor organization of approximately two million working people in the United

States and Canada united by the belief in the dignity and worth of workers and the services they provide. SEIU is dedicated to improving the lives of workers and their families and to creating a more just and humane society.

*Amicus* Economic Policy Institute is a nonprofit, nonpartisan think tank created in 1986 to include the needs of low- and middle- income workers in economic policy discussions. EPI conducts research and analysis on the economic status of working America, proposes public policies that protect and improve working conditions of low- and middle-income workers, and assesses policies with respect to how well they further these goals.

*Amici*'s original comments emphasized the urgent need for the Rule, and the Department's reliance on those comments underscores that the Department's finalization of the Rule was well-reasoned and not, as plaintiffs claim, arbitrary and capricious. Because *amici* and the hard-working people they represent have a strong interest in seeing the Rule upheld, *amici* have submitted this brief to better illuminate to the Court the impacts of the Rule. *Amici* believe that their views, as considered by the Department and as informed by the experience of

their members—specifically home care workers, farmworkers, truck drivers, and app-based delivery drivers—demonstrate that the final Rule was not arbitrary and capricious, but rather "reasonable and reasonably explained."[3] Therefore, should the Court consider Plaintiffs' likelihood of success on the merits of their claims,[4] this Court should conclude that Plaintiffs are unlikely to succeed on the merits.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Workers who grow our food, who transport that food and other goods essential to a functioning economy, who care for us in health crises and in old age, and who are instrumental to the innovative gig economy regularly labor for long hours in dangerous and demanding jobs. Too often, they are treated as independent contractors, not as the employees they are. Misclassified as independent contractors, they are denied the promise of a minimum wage and overtime, among other basic workplace protections. Misclassification makes these already difficult jobs untenable—despite working longer and longer hours, misclassified

---

[3] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[4] *Amici* agree with Defendants that Plaintiffs' likelihood of success on the merits—and the other preliminary injunction factors besides irreparable harm—are not properly before this Court. Appellees' Br. (ECF No. 155), 37-39, *see also* Appellants' Br. (ECF No. 19), 21-30.

workers frequently cannot earn sustaining wages, provide for their families, or achieve basic financial security.

The Department of Labor's effort to reduce these misclassifications through the Rule is urgently needed and appropriately reflects the experience of a broad range of misclassified workers. To this end, *amici* focus on the experiences of home care workers, farmworkers, app-based delivery drivers, and truck drivers, all of whom work in industries in which misclassification is pervasive. These experiences illustrate the realities for misclassified workers across numerous sectors and industries.

The Rule correctly codifies criteria for classifying individual workers as either employees or independent contractors, adopting an "economic reality" test including the consideration of six factors to determine whether a worker "is in business for themself."[5] Those factors are: (1) the employee's opportunity for profit or loss based on managerial skill; (2) capital or entrepreneurial investments; (3) the permanence of the work relationship; (4) the nature and degree of control over work and economic aspects of the working relationship; (5) the extent to which the

---

[5] 89 Fed. Reg. at 1742.

work is integral to the potential employer's business, and (6) whether the worker uses specialized skills in connection with business-like initiative.[6] In each sector on which this brief focuses, these criteria provide needed clarity as to proper classification of workers.

The distinction between classification as an employee or as an independent contractor is not academic, but has enormous consequences for individual workers. As the workers *amici* serve have experienced, misclassification means the loss of minimum wage and overtime guarantees, the loss of compensable travel time, no access to health or retirement benefits, no unemployment or worker's compensation rights, increased tax burdens, more dangerous workplaces, and numerous other significant disadvantages. Misclassification also carries substantial negative economic impacts with consequences beyond the wellbeing of workers themselves.

*Amici* discuss below first the ways in which the Rule will reduce misclassification in multiple sectors, and thereafter the ways in which doing so will reduce ongoing harms to the workers in these sectors and more broadly.

---

[6] *Id*. at 1742-43.

## ARGUMENT

### I.     The Rule will reduce the number of employees being misclassified as independent contractors.

While *amici* focus on workers in four sectors, misclassification is widespread.[7] Common to workers across multiple sectors: (1) they are frequently misclassified as independent contractors; (2) under the Rule, it would be clear that they should generally be classified as employees; and (3) they are predominantly members of disadvantaged socioeconomic groups, whose misclassification exacerbates the disadvantages and inequities they already face.

---

[7] *Amicus* SEIU specifically discussed similar problems faced by workers in janitorial services and app-based rideshare drivers in a comment in support of the Rule. SEIU Comment, *supra* n. 2. In addition to some of the categories of workers discussed in this brief, a*micus* EPI's comment in support of the Rule discussed widespread misclassification and its impacts among construction workers, janitors and cleaners, retail sales workers, housekeeping cleaners, landscaping workers, customer service representatives, security guards, and manicurists and pedicurists. EPI Comment, *supra* n. 2. Misclassification affects workers in sectors well beyond these as well.

*a. The Rule will prevent widespread misclassification of home care workers.*

There are over two million home care workers in the United States.[8] These workers provide health care support, essential personal assistance services, and improve the quality of life for individuals with increased needs—typically older adults or people with disabilities. Home care workers may monitor vital signs; administer medications; collect medical samples for testing; keep sterile dressings clean; assist with toileting, bathing, and grooming; change linens; do laundry; and provide transportation to medical appointments. Many home care workers also provide otherwise absent companionship to their clients or provide reprieves for family caregivers. This work provides important psychological and emotional support to clients, and can include playing games together, talking, or taking clients on outings.

Home care workers affiliated with a home care agency generally do not operate their own businesses—instead, clients engage the agency, and the agency, in turn, pays workers an hourly rate to perform specific

---

[8] PHI Nat'l, *U.S. Home Care Workers: Key Facts*, 2 (2019), https://tinyurl.com/f6aeuan2.

duties for those clients.[9] Home care workers' labor is integral to agencies' business—in fact, it is essentially the entirety of the service agencies offer. In general, home care workers do not invest capital in their work; have little or no ability to set their duties, hours, or wages; and are subject to intervention from agencies if their work does not meet expectations.[10] Considering these facts under the Rule's "economic reality" test, home care workers are employees who are not "in business for themselves."[11]

And yet, historically, home care workers have been misclassified as independent contractors; examples of such misclassification are numerous. A 2021 Department of Labor investigation identified fifty misclassified home care workers employed by a Tennessee home care agency,[12] and a similar 2022 investigation identified seventy-five such

---

[9] *See, e.g.,* David J. Rodwin, *Independent Contractor Misclassification Is Making Everything Worse: The Experience of Home Care Workers in Maryland*, 14 St. Louis Univ. J. of Health L. & Pol'y 47, 49-50 (2020), https://tinyurl.com/bdf2nbf5.

[10] Nat'l Emp. L. Project, *Independent Contractor Classification in Home Care*, 1 (2015), https://tinyurl.com/3yh79teh.

[11] 89 Fed. Reg. at 1638.

[12] Dep't of Lab., *US Department of Labor Recovers More Than $358K in Back Wages for 50 Workers at Tennessee Home Healthcare Service* (Apr. 20, 2021), https://tinyurl.com/mpdmurve.

workers in Pennsylvania.[13] These are not isolated incidents; home care agencies "regularly misclassify their home workers as independent contractors in order to continue to avoid paying them overtime for all hours worked, including travel time."[14] This widespread misclassification in the home care industry is especially pernicious because of the demographics of home care workers; eighty-seven percent of United States home care workers are women, and sixty-two percent are people of color.[15]

    b. *The Rule will reduce the misclassification of farmworkers on the basis of seasonal employment.*

An estimated 2.4 million farmworkers provide essential services in all fifty states, working long hours in extreme weather and risking injury and illness to deliver food to American consumers. Farmworkers play a key role in the American food supply by cultivating and

---

[13] Dep't of Lab., *Federal Court Requires Pennsylvania Home Healthcare Agency to Pay $293K in Back Wages, Damages to 75 Workers Denied Overtime* (Aug. 22, 2022), https://tinyurl.com/2nacuaa4.

[14] Nat'l Domestic Workers All., Comment Letter on Employee or Independent Contractor Classification under the Fair Labor Standards Act 3 (Dec. 7, 2022), https://tinyurl.com/52dcmd5j.

[15] Rodwin, *supra* n. 9, at 54.

harvesting crops and raising and tending to livestock on farms owned by others.

This work is difficult, dangerous, and physically demanding. When considered under the "economic reality" test, it is also clearly the work of employees, not independent contractors. Farmworkers do not exercise business-like initiative; they perform set and defined tasks.[16] As with home care workers, the labor of farmworkers is integral to the business of their employers—absent farmworkers, growers could not raise crops or livestock. It is therefore unsurprising that courts to consider the issue have "unanimously concluded that farmworkers perform tasks integral to the business of the growers to whom they provide services."[17]

---

[16] *See e.g. Castillo v. Givens*, 704 F.2d 181, 191 (5th Cir. 1983) (characterizing farm work as "a simple task"); *Donovan v. Gillmor*, 535 F.Supp. 154, 162 (N.D. Ohio 1982) ("[M]igrants exercise no entrepreneurial discretion whatsoever. Other than working faster or longer hours, the migrants cannot increase their 'profits.' Upon closer examination, this profit is nothing more than wages paid").

[17] Tex. Rio Grande Legal Aid, Comment Letter on Independent Contractor Status Under the Fair Labor Standards Act 3 (Oct. 26, 2020), https://tinyurl.com/bduvd65r. This relatively scattered patchwork of such decisions has led to corrected classification for those workers whose employers have been haled into court, but because farmworkers face significant retaliation for reporting violations, widespread misclassification nevertheless persists throughout the industry, Hum. Rts. Watch, *Cultivating Fear: The Vulnerability of Immigrant*

The other factors of the "economic reality" test make clear that farmworkers are employees, not independent contractors. Farmworkers make *de minimis*, if any, "capital contributions" to their employers' businesses.[18] Although farmworkers' employment relationship with a given producer may be seasonal, many return to the same producers for a season year after year.[19] Under the Rule, "the seasonal or temporary nature of work by itself would not necessarily indicate independent contractor classification. Where a lack of permanence is due to operational characteristics that are unique or intrinsic to particular businesses or industries and the workers they employ, this factor is not necessarily indicative of independent contractor status unless the worker is exercising their own independent business initiative."[20] This clarification is a critical bulwark against continued misclassification of seasonal workers.

---

*Farmworkers in the U.S. to Sexual Violence and Sexual Harassment* 5 (2012), https://tinyurl.com/4puczd4u.

[18] *See, e.g., Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) (farmworkers provide only gloves); *Cavazos v. Foster*, 822 F.Supp. 438, 443 (W.D. Mich. 1993) (farmworkers provide only buckets).

[19] *Lauritzen*, 835 F.2d at 1537 (citations omitted).

[20] 89 Fed. Reg. at 1742-43.

Without this clarity, misclassification of farmworkers is commonplace. The California Agricultural Relations Board explains that misclassification of farmworkers is "a persistent problem in California;"[21] the New Jersey Department of Labor and Workforce Development "uncovered significant patterns of employers' misclassification of workers through monthly enforcement sweeps . . . targeted in [sectors including] large-scale farming operations;[22] and the Sixth Circuit affirmed a District Court's finding that a Michigan pickling cucumber farmer had misclassified his harvesters as independent contractors.[23] While these examples are illustrative and make clear the geographic spread of the problem, they are far from exhaustive. "Issues frequently arise in the farm labor market over whether farmworkers or farm labor contractors should be classified as employees or independent contractors."[24] Even resources intended for

---

[21] *Cinagro Farms, Inc.*, 48 A.L.R.B. No. 2, 2 (2022).
[22] *The Misclassification of Workers as Independent Contractors: What Policies and Practices Best Protect Workers?: Hearing Before the Subcommittee on Workforce Protections, Committee on Education and Labor*, 110th Cong. (2007), https://tinyurl.com/5n7yenud
[23] *Perez v. D. Howes, LLC*, 790 F.3d 681 (mem.) (6th Cir. 2015); *Perez v. Howes*, 7 F. Supp. 3d 715 (W.D. Mich. 2014).
[24] Tex. Rio Grande Legal Aid, *supra* n. 17, at 1.

use by producers highlight the prevalence of misclassification in the industry.[25]

Farmworkers are also overwhelmingly members of disadvantaged groups. About 50% of American farmworkers are Latino/a, and approximately 10% self-identify as indigenous.[26] As with home care workers, denying farmworkers basic wage and hour protections exacerbates existing demographic inequalities.

    c. *The Rule will prevent continued misclassification of app-based delivery drivers, especially on the basis of a misunderstanding of their capital investment and the degree of their control of their work*

There are an estimated 65,000 app-based delivery drivers in New York City alone;[27] while a*mici* know of no reliable national estimate of

---

[25] *See, e.g.,* Iowa St. Univ. Extension and Outreach, *Risk Management Practices: Avoid Employment Pitfalls on the Dairy Farm* 1 (reviewed Feb. 2024), https://tinyurl.com/3s5fxye5 ("misclassification of workers as 'independent contractors' rather than 'employees' is viewed as a significant problem by federal and state agencies"); Bailee Peters, Nebraska Farm Bus., Inc., *Agricultural Employees vs. Independent Contractors* 1 (June 2019), https://tinyurl.com/mu2s4j8f (misclassification is "[o]ne of the most commonly seen mistakes among clients").
[26] Farmworker Just., *supra* n. 2, at 3.
[27] Maria Figueroa et al., Los Deliveristas Unidos, *Essential but Unprotected: App-based Food Couriers in New York City* 17 (2021), https://tinyurl.com/3z2y3bby.

the number of such drivers, there are certainly hundreds of thousands, if not millions, nationally. As this relatively new workforce came into being, it has been widely, but incorrectly, classified as comprising independent contractors.[28]

Under the Rule, more app-based delivery drivers will be correctly classified as employees. Two clarifications in the Rule are particularly important here. First, the Rule makes clear that whether an employer sets the worker's schedule is only one factor among many in evaluating the employer's degree of control over the performance of work—and must be considered alongside factors like whether the employer uses technological means to supervise performance, controls prices and rates, and controls marketing for the services offered by the employee.[29] This clarification ensures that drivers are not misclassified as independent contractors simply because they set their own schedules. The Rule additionally clarifies that an app-based delivery driver's vehicle is generally not a capital investment that would suggest classification as

---

[28] *See, e.g.*, Tax Outreach Ctr., *How Do Food Delivery Couriers Pay Taxes*, https://tinyurl.com/3f8e97wf ("If you deliver food for GrubHub, Postmates, DoorDash, or UberEATS . . . you are an independent contractor rather than an employee.").

[29] 89 Fed. Reg. at 1743.

an independent contractor. To the contrary, "[w]here any vehicle is suitable to perform the work purchase of the vehicle is generally not a capital or entrepreneurial investment."[30]

The remaining factors to be considered in the "economic reality" test also make clear that these workers are employees under the Rule. Drivers' only ability to impact their earnings is choosing to accept more delivery assignments; they cannot negotiate their rates or otherwise exercise business-like skills to increase their take-home pay. In considering app-based ride-share drivers' ability to influence their own profit or loss, the Third Circuit previously concluded that such drivers' similar scope of options and control would allow a "reasonable fact-finder" to conclude that this factor supported a conclusion that they were employees.[31] And while their work requires no special skills, no worker is more integral to the business of app-based delivery providers than the drivers who actually make the deliveries.

---

[30] *Id.* at 1683.

[31] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 147 (3rd Cir. 2020), *amended*, 979 F.3d 192 (3rd Cir. 2020), *and cert. denied*, 141 S. Ct. 2629 (mem.) (2021).

Like the other workers *amici* have discussed, online gig workers,
including app-based delivery drivers, are predominantly economically
disadvantaged,[32] and disproportionately people of color. Research
indicates that as many as 30% of Hispanic adults have done online gig
work, along with 20% of Black adults, compared to only 12% of white
adults.[33]

### d. The Rule will limit pervasive misclassification of truck drivers.

Businesses and consumers alike rely on truck drivers as a key piece
in the American supply chain, moving all manner of material and goods
throughout all fifty states. With more than 3.5 million truck drivers on
the roads, "driving large tractor-trailers or delivery trucks is one of the
largest occupations in the United States."[34] "Since misclassification is
illegal, limited data exist on its extent, but it is clear that
misclassification is concentrated in segments where the use of contract

---

[32] *See, e.g,* Eric Leverage & Samantha Dalal, Colorado Jobs with
Justice, *The Gig Gap: The Reality of Denver Gig Workers 2022 Report* 12
(Oct. 2022), https://tinyurl.com/uk29dppz (11.5% of online gig workers
in Denver rely on at least one form of public benefits).

[33] Risa Gelles-Watnick & Monica Anderson, *Racial and ethnic
differences stand out in the U.S. gig workforce*, Pew Rsch. Ctr. (Dec. 15,
2021), https://tinyurl.com/3wwf4w7m.

[34] Jennifer Cheeseman Day & Andrew W. Hait, U.S. Census Bureau,
*America Keeps on Truckin'* (June 6, 2019), https://tinyurl.com/ybtrup77.

truck drivers is prevalent."[35] For instance, a 2010 report concluded that of the 82% of port truckers classified as independent contractors, approximately 80% are misclassified.[36]

Some truck drivers are correctly classified as independent contractors. Owner-operators who operate under their own authority, own or independently lease their truck, and are registered on the International Registration Plan plate are able to book their own freight from a free-market "load board," and negotiate the rate for their services directly.[37] These owner-operators carry their own insurance.[38] These drivers would still be classified as independent contractors under the economic reality test—they are clearly "in business for themselves."[39] On the opposite end of the spectrum from owner-operators, some drivers lease their trucks directly from a freight company, operate under that company's authority, access insurance

---

[35] Carol Zabin & Sam Appel, *Truck Driver Misclassification: Climate, Labor, and Environmental Justice Impacts*, U.C. Berkley Lab. Ctr. 8 (Aug. 22, 2019), https://tinyurl.com/4u2pb2f9.

[36] Rebecca Smith et al., Nat'l Emp. L. Project, *The Big Rig: Poverty, Pollution, and the Misclassification of Truck Drivers at American Ports* 19 (Dec. 8, 2010), https://tinyurl.com/dhawfyfy.

[37] REAL Women in Trucking, *supra* n. 2, at 6.

[38] *Id.*

[39] 89 Fed. Reg. at 1638.

through that company, can only carry loads for that company, cannot negotiate the rate for their services, have little control over their own schedules, and may be subject to forced dispatch.[40] While these drivers clearly should be classified as employees, they are frequently misclassified—the Rule's "economic reality" test would correct existing misclassifications for this group.

Many drivers are in a gray area between these two arrangements. For example, a driver may own their truck and negotiate their own loads but rely on a company for their operating authority. Others may formally be permitted to set their schedule and accept freight from other companies, but because of actual conditions imposed by their employer, be functionally unable to do so. Most drivers who access and negotiate loads and rates through a free-market load board would likely be classified as independent contractors under the Rule: this will generally be a correct result, and would reflect both the significant control these drivers exercise over their work and their ability to influence their own profit and loss through business decision-making.

---

[40] REAL Women in Trucking, *supra* n. 2, at 6.

The Rule's clarifications concerning capital investment are important bulwarks against continued misclassification of other gray area drivers, however. The Rule's discussion of truck drivers who lease their truck from the company for which they drive noted that such leases may constitute capital investments "if a driver is not required to lease a truck from the employer, is able to consider independent financing options, is able to meaningfully negotiate the terms of the lease with the employer, is not required by the employer to work for it for a minimum period of time nor prohibited by it from using the leased truck to work for others. . . especially if the lease could ultimately result in the driver's wholly owning the truck."[41] Phrased differently, if a freight company offers ordinary leases, and a driver opts to lease a truck from such a company, that is not suggestive of an employee relationship, and indeed, the driver's capital investment may suggest independent contractor status. That guidance is consistent with economic reality, and importantly, favors classifying as employees those drivers who build no equity in the trucks they lease from companies, and who may lose their lease if they miss a payment, quit, or are fired.

---

[41] 89 Fed. Reg. at 1678.

Under the remaining factors in the economic reality test, drivers who are unable to exercise actual discretion in selecting and negotiating individual jobs—including those with restrictive leases through a specific freight company—are employees. Drivers are integral to the business of freight companies, and drivers who have no control over job selection or rates have little or no meaningful ability to influence their income through entrepreneurial or business skill and are subject to significant control by the company who has an exclusive claim on their work.

Like the other workers *amici* represent, truck drivers are disproportionately members of economically disadvantaged groups: according to a study of truckers in California, for example, over seventy-five percent of truckers are people of color, and more than half are immigrants.[42]

---

[42] Ratna Sinroja, et al., *Misclassification in California: A Snapshot of the Janitorial Services, Construction, and Trucking Industries*, U.C. Berkeley Lab. Ctr. (Mar. 11, 2019), https://tinyurl.com/bddx7y2k.

## II.   Misclassification has real and devastating consequences, regardless of the industry in which the misclassified workers are employed.

Employees are entitled to significant benefits that are generally not available to independent contractors. Misclassification deprives individual workers of these benefits, leading to reduced compensation, access to benefits, and workplace protections. Misclassification of workers also carries broader economic costs—in other words, misclassification is harmful not only to misclassified workers, but to the whole economy.

### a. Misclassification results in widespread wage theft and other harms to workers.

Misclassifications reduce take-home pay, effectively subjecting workers to wage theft. Specifically, independent contractors can be paid below minimum wage, can receive the same hourly rate for time worked over forty hours per week, and can go unpaid for travel time that would be paid for employees. Among port truck drivers, independent contractors earn net incomes 18% below their employee counterparts.[43] As of 2022, Louisiana home care workers had a median hourly wage of

---

[43] Smith et al., *supra* n. 36, at 19.

$9.46;[44] at that rate, a home health care worker with a single dependent

who was *paid* for 40 hours a week of work for the full year of 2022

would have earned less than the Federal Poverty Level for a family of

two—the 2022 poverty threshold for a family of two with one

householder under 65 and one child under 18 was $20,172,[45] while 40

hours per week for 52 weeks at a wage of $9.46 is $19,676.80.[46] While

some of those workers earn more than the minimum wage,

misclassification means that they may not be paid for all of their time

and are not entitled to other employment benefits, which can be

essential for workers living so close to the poverty line. And a recent

analysis of app-based rideshare and delivery drivers in Denver found

that drivers earned about $5.49 per hour after expenses—well below the

---

[44] PHI, *Workforce Data Center* (last visited Aug. 19, 2024),
https://tinyurl.com/y4cwzax7.
[45] U.S. Census Bureau, *Poverty Threshold for 2022 by Size of Family and Number of Related Children Under 18 Years* (last accessed Aug. 19, 2024), https://tinyurl.com/4pte9p9b.
[46] While the 2022 median hourly wage for a home care worker in Mississippi and Texas was slightly higher—$10.52 in both states—a home care worker paid for 40 hours of work per week for the full year at that rate would have earned $21,882, close to the Federal Poverty Level for a family of two. PHI, *Workforce Data Center* (last visited Aug. 20, 2024), https://tinyurl.com/yfc2kjvr.

minimum wage to which they would have been entitled if they were classified as employees.[47]

Even these numbers understate the wage gap. Independent contractors also face greater tax burdens, paying full Social Security and Medicare taxes, rather than sharing those costs with their employers, as employees do.[48] Misclassification may also create additional state and local tax and reporting burdens, "including requirements to pay for workers' compensation and other state licensing and insurance requirements for businesses."[49]

Some misclassified workers are also responsible for work expenses, further reducing net earnings from their labor. A survey of San Francisco app-based delivery drivers concluded that, after expenses like gas and repairs, up to 12% of such drivers might be earning *nothing*.[50] One rideshare driver drives between ten and twelve hours daily, and it can take him up to twenty-five rides each day just to break even on gas

---

[47] Leverage & Dalal, *supra* n. 32, at 5.

[48] EPI, *supra* n. 2, at 6.

[49] Nat'l Empl. L. Project, *supra* n. 10 at 2.

[50] Chris Benner, UC Santa Cruz Inst. for Soc. Transformation, *On-Demand and On-the-edge: Ride-hailing and delivery workers in San Francisco* 23 (Oct. 16, 2020), https://tinyurl.com/3p85tr3j.

and other necessary expenses.[51] To increase the amount he could drive, port truck driver Samuel Talavera Jr. slept in his truck and kept a soda bottle at hand to minimize bathroom breaks. "He became a ghost to his family," but, due in large part to the expense of the truck his company required him to lease, he had weeks where his net take home pay was $112, $33, and even sixty-seven cents.[52] If these workers were correctly classified as employees, they would be guaranteed minimum wage, would be paid for all of their time, and would not have to bear all of the maintenance and other expenses associated with their work.

Further, as the Rule notes, misclassified employees "generally do not receive employer-sponsored health and retirement benefits, potentially resulting in or contributing to long-term financial insecurity."[53] Misclassification may also cost employees access to unemployment insurance and workers' compensation,[54] which compounds the fact that misclassified workers—including home care workers, farmworkers, and

---

[51] SEIU, *supra* n. 2, at 6.

[52] Brett Murphy, *Rigged: Forced into Debt. Worked Past Exhaustion. Left with Nothing.*, USA Today (June 16, 2017), https://tinyurl.com/mrxe5aj4.

[53] 89 Fed. Reg. at 1736.

[54] John Schmitt et al., *The economic costs of worker misclassification*, Econ. Pol'y Inst. (Jan. 25, 2023), https://tinyurl.com/5n7yzm7a.

truck drivers—often perform dangerous or physically demanding work. Similarly, in states where employees are entitled to earned paid sick leave, misclassified workers likely will not accrue such leave—leaving them with the choice between working while sick, or forgoing pay and potentially endangering their opportunity to continue working for the same employer. And it is no better when misclassified workers are injured on the job. One misclassified home care worker was helping her client into his wheelchair when he grabbed her leg to steady herself. She fell on a table, causing spinal issues that prevented her from working for several months. Her employer fought her workers' compensation claims, arguing that she was an independent contractor. With neither income nor workers' compensation, she was only able to avoid eviction with assistance from a non-profit.[55]

While farmworkers remain excluded from the full protections to which employees are entitled, proper classification provides some essential protections. These include access to clean toilets and hand washing stations, access to cool and clean drinking water, and safety

---

[55] Pub. Just. Ctr., *supra* n. 2, at 6.

standards for any provided housing and transportation.[56] It also promotes some level of financial security, including accurate records of their hours and pay at least every two weeks with a full paystub, which can be a critical element to obtaining Social Security benefits.

Employees are protected from retaliation for reporting workplace violations,[57] while misclassification enables employer retaliation, deterring workers from reporting potential violations or advocating for workplace improvements. Farmworkers, for instance, who push back against "abuse, or report incidents to management, say they suffer retaliation, getting fewer hours, more abusive treatment, or worst of all, losing their jobs altogether."[58] For many farmworkers, loss of their job can also endanger their visa status and potentially result in deportation—even when they are fired as retaliation for raising a legitimate concern.

Misclassification also leads to more dangerous working conditions. In trucking, for example, "economic pressures encourage widespread

---

[56] Dep't of Lab., *Cultivating Compliance: An Agricultural Guide to Federal Labor Law*, https://tinyurl.com/2vpk9rje.
[57] 29 U.S.C. § 215(a)(3).
[58] Hum. Rts. Watch, *supra* n. 17, at 5.

evasion of safety regulations" by misclassified workers.[59] Drivers facing extreme economic pressures, in part as a result of misclassification, have little choice but to operate unsafe chassis for more hours than regulations permit, with less rest than legally required. And because many misclassified drivers are responsible for their own maintenance costs, addressing the safety concerns with their equipment may not be a realistic option.[60] This endangers not only these drivers, but other motorists.

The effects of misclassification are inequitably distributed and exacerbate exiting inequality. Among each of the industries represented by *amici* and more broadly as well, misclassified workers are frequently members of demographically disadvantaged groups: "due to occupational segregation and other labor market disparities rooted in structural racism, people of color and immigrant workers are more likely to be in occupations where misclassification is common."[61]

---

[59] Smith et al.*, supra* n. 36, at 19.

[60] *Id*. *See also* Murphy, *supra* n. 52 (drivers had "no choice but to break federal safety laws that limit truckers to 11 hours on the road each day").

[61] EPI*, supra* n. 2, at 2. *See also* SEIU, *supra* n. 2, at 1 ("worker misclassification is pervasive in low-wage, labor-intensive industries

*b. Misclassification has negative effects beyond misclassified workers.*

In addition to harming misclassified employees, misclassification

"enacts an enormous toll"[62] on the American economy. The Department

noted that, "[t]o the extent workers were incorrectly classified due to

misapplication of the 2021 IC rule, that could have led to reduced tax

revenues,"[63] and unsurprisingly concluded that the "[R]ule could have

an impact on state tax revenue."[64] As a result of misclassified

individuals not reporting and paying income taxes, employers and

misclassified employees not paying Social Security and Medicare taxes,

and employers of misclassified workers not paying federal

unemployment taxes, misclassification cost upwards of $1.6 billion in

federal revenue in 1984;[65] similarly, misclassification of even 1% of

---

where women and people of color, including Black, Latino, and Asian-American workers, are overrepresented").

[62] Nat. Empl. L. Project, *Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries* 1 (Oct. 2020), https://tinyurl.com/5ecayeej.

[63] 89 Fed. Reg. at 1737

[64] *Id.*

[65] U.S. Gov't Accountability Off., GAO-09-717, *Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention*, 12 (2009), https://tinyurl.com/577zbnaj (in 1984 dollars).

workers costs unemployment funds an estimated $198 million annually.[66]

These direct impacts do not even account for incorrectly classified workers needing to rely more heavily on public benefits,[67] and having less available income to spend. In at least the trucking context, pervasive misclassification also has negative environmental consequences: "[a]s a result of the capital barriers contractors face, this segment of the trucking industry has the lowest compliance rates with California's current clean vehicle regulations."[68]

## CONCLUSION

The Rule is well-supported by the administrative record, including the substantial information provided by *amici*. As a result of the Department's careful reasoning, the Rule reflects individual workers' realities and provides much-needed clarity to ensure that more workers will be correctly classified as employees, rather than continuing to be misclassified as independent contractors.

---

[66] Dep't of Lab., *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* 69 (Feb. 2000), https://tinyurl.com/bdhzc5ud.
[67] *See e,g.,* Leverage & Dalal, *supra* n. 32.
[68] Zabin & Appel, *supra* n. 35.

31

Dated: August 23, 2024                Respectfully Submitted,

/s/ Mark B. Samburg
MARK B. SAMBURG
*Counsel of Record*
ROBIN THURSTON
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
msamburg@democracyforward.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2024, I caused the foregoing to be served upon all parties or their counsel of record by electronically filing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit via the CM/ECF system.

*/s/ Mark B. Samburg*
Mark B. Samburg

# CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,908 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in 14-point Century Schoolbook font.

*/s/ Mark B. Samburg*
Mark B. Samburg

August 23, 2024